PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 18-1212

————————————

MARIE CURTO; DIANA LUSARDI; STEVE LUSARDI,

Appellants

v.

A COUNTRY PLACE CONDOMINIUM ASSOCIATION,
INC.; ABC CORP. 1 TO 10; JOHN DOE 1 TO 10

————————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-16-cv-05928)
District Judge: Honorable Brian R. Martinotti

————————————

Argued March 5, 2019

Before: AMBRO, BIBAS, and FUENTES, Circuit Judges

(Opinion filed: April 22, 2019)

Lenora M. Lapidus
Sandra S. Park (Argued)

American Civil Liberties Union
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Jeanne LoCicero
Liza F. Weisberg
Edward Barocas
American Civil Liberties Union of New Jersey Foundation
89 Market Street
P.O. Box 32159
Newark, NJ 07102

Daniel Mach
Heather L. Weaver
American Civil Liberties Union
915 15th Street, N.W., 6th Floor
Washington, DE 20005

Jose D. Roman
Powell & Roman
131 White Oak Lane
Old Bridge, NJ 08857

 Counsel for Appellants

Angela Maione Costigan (Argued)
Costigan & Costigan, LLC
1222 Spruce Street
Philadelphia, PA 19107

 Counsel for Appellee

2

Lila Miller
Sasha M. Samberg-Champion
Relman Dane & Colfax PLLC
1225 19th Street, N.W., Suite 600
Washington, DE  20036

      Amicus Appellant
      National Fair Housing Alliance

Kevin T. Snider
Pacific Justice Institute
9851 Horn Road, Suite 115
Sacramento, CA  95827

David J. Hallstrom
3C01 Lansdowne Terrace
London, WC1N 1AS
United Kingdom

      Amicus Appellee
      Pacific Justice Institute

_____

OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>,

Marie Curto wanted to swim with her family after work.  Steve Lusardi wanted to swim with his wife, who had disabilities after a series of strokes and needed pool therapy to recover.  But they lived at A Country Place, and its Condominium Association had adopted rules segregating use

3

of the communal pool by sex. By 2016 over two-thirds of all swimming hours throughout the week were sex-segregated. After they were fined for violating this policy, Curto and the Lusardis sued, alleging violations of the federal Fair Housing Act (sometimes referred to as the "FHA"), 42 U.S.C. §§ 3601 *et seq.*, and New Jersey state law.

The District Court granted summary judgment to the Condominium Association because, in its words, "the gender-segregated schedule applies to men and women equally." *Curto v. A Country Place Condominium Assoc.*, 2018 WL 638749, at *4 (D.N.J. 2018). We disagree. On the facts before us, the pool schedule discriminates against women in violation of the FHA. We need not determine whether sex-segregated swimming hours necessarily violate the FHA, or whether a sufficiently limited and more even-handed schedule might be justifiable, because the schedule actually adopted by the Condominium Association is plainly unequal in its allotment of favorable swimming times. Thus we reverse.

## I. Background

A Country Place Condominium Association, Inc. is a "55 and over" age-restricted condominium association located in Lakewood, New Jersey. Lakewood has a large and growing Orthodox Jewish population, and so does A Country Place; by 2016, when the events in this litigation took place, approximately two-thirds of its residents were Orthodox.

One of the amenities at A Country Place is its community pool, which reopened in 2011 after being closed for renovations. It is maintained using funds from the $215 monthly maintenance fee paid by each of the community residents. After the pool reopened, the Condominium Association adopted rules for pool use creating certain hours when only members of a single sex were allowed to swim.

4

This was done to accommodate the Orthodox principle of *tznius*, or modesty, according to which it is improper for men and women to see each other in a state of undress—including bathing attire. This principle—according to Fagye Engleman, the Association's representative in this litigation—means that the Orthodox residents cannot comfortably swim at a time when members of the opposite sex might be present at the pool.

Prior to 2016 the schedules provided for only a handful of sex-segregated swimming hours throughout the week, but as the Orthodox membership at A Country Place increased, the Association increased the number of sex-segregated hours. Thus in 2016 the Association's Board of Directors adopted a new schedule with greatly increased segregated swimming hours:

### A Country Place Pool Schedule 2016

| | | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | |
|---|---|---|---|---|---|---|---|---|---|
| | 8:00-11:00am | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | | 8:00-11:00am |
| | 11:00am-1:00pm | Mens Swim | Mens Swim | Mens Swim | Mens Swim | Mens Swim | Mens Swim | | 11:00am-1:00pm |
| All Residents | 1:00-3:00pm | All Residents | All Residents | All Residents | All Residents | All Residents | All Residents | All Residents All Day | 1:00-3:00pm |
| Adults Only | 3:00-4:00pm | Ladies Swim Adult Residents Only | | | | | Ladies Swim | | 3:00-4:00pm |
| | 4:00-5:00pm | Ladies Swim | Ladies Swim | | | | Mens Swim | | 4:00-5:00pm |
| | 5:00-6:45pm | Ladies Swim | Mens Swim | Ladies Swim | Mens Swim | Ladies Swim | | | 5:00-6:45pm |
| | 6:45-9:00pm | Mens Swim | | | | | | | 6:45-9:00pm |

Under this schedule, a total of 31.75 hours each week were defined as "men's swim," when women were prohibited from using the pool; 34.25 hours were defined as "women's swim," when men were prohibited. Only 25 hours were open to people of all genders. Excluding Saturday, which was left open for mixed-gender swimming because Orthodox

5

residents would not go swimming on the Jewish Sabbath, only 12 hours during the other six days of the week were available for integrated swimming. Of note, a large majority of the hours in the evening were set aside for men, including the period from 6:45 p.m. onward every day of the week (except Saturday) and the entire period from 4:00 p.m. onward on Friday. As for Friday afternoons, Engleman testified this was done because women are at home preparing for the Sabbath during that time.

After the controversy with the plaintiffs began, the Association adopted a modified schedule:

**A Country Place Pool Schedule 2016**   effective - July 17, 2016

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | |
|---|---|---|---|---|---|---|---|---|
| 8:00-11:00am | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | Ladies Swim | | 8:00-11:00am |
| 11:00am-1:00pm | Mens Swim | Mens Swim | Mens Swim | Mens Swim | Mens Swim | Mens Swim | | 11:00am-1:00pm |
| 1:00-3:00pm | All Residents | All Residents | All Residents | All Residents | All Residents | All Residents | | 1:00-3:00pm |
| 3:00-4:00pm | Ladies Swim Adult Residents Only | Ladies Swim / Adult Residents Only | | | | Ladies Swim | All Residents All Day | 3:00-4:00pm |
| 4:00-5:00pm | Ladies Swim | Adult Residents Only | | | | Mens Swim | | 4:00-5:00pm |
| 5:00-6:00pm | | Mens Swim | Ladies Swim | Mens Swim | Ladies Swim | | | 5:00pm |
| 6:00-6:45pm | Mens Swim | Mens Swim | Ladies Swim | Mens Swim | Ladies Swim | | | 6:45pm |
| 6:45-9:00pm | | Mens Swim | | | | | | 6:45-9:00pm |

(Sunday left column: "All Residents" for 1:00-3:00pm)

The only significant change was expanding the "adult residents only" period of "ladies' swim." Only the 6:00 to 6:45 p.m. period on Sunday, which went from "ladies' swim" to "men's swim," was allocated to a different gender than under the initial 2016 schedule. Thus this revised schedule provided for 56 hours of segregated hours (32.5 hours for men and 33.5 hours for women), along with the same 12 hours of integrated swimming Sunday through Friday.

6

Plaintiff Marie Curto owns a unit at A Country Place,[1] and stated in the complaint that one of the reasons she chose to live there was to go swimming with her family. Plaintiffs Steve and Diana Lusardi are a married couple who also own a unit in the residential facility. They stated in the complaint that one reason they moved back to the residential facility (where they had lived previously) was to use the pool together. Diana Lusardi suffered two strokes in 2013, which resulted in physical disabilities, and she wished to engage in pool therapy with her husband.

On June 15, 2016, a resident at A Country Place notified the Board that Curto had been swimming during a men's swim period. The next day the Board held a meeting on the issue, at which Steve Lusardi read a statement explaining why he wanted to use the pool with his wife and challenging the pool schedule as discriminatory. In the following weeks, the plaintiffs continued to use the pool in violation of the posted schedule and were fined $50 each by the Board. The plaintiffs engaged in much back-and-forth with the Board about the validity of these fines, but to no avail. They ultimately filed a complaint alleging violations of the Fair Housing Act as well as several New Jersey state laws regarding both discrimination and the rules for condominium associations.

After discovery, both parties moved for summary judgment. The District Court granted the Condominium Association's motion on the plaintiffs' Fair Housing Act

---

[1] At least she owned a unit there when this lawsuit was filed. The same is true of the Lusardis. It appears, though this is not contained in the record and does not affect the outcome of our case, that some or all of the plaintiffs have subsequently moved out of the condo facility.

claim and declined to exercise supplemental jurisdiction over the state law claims that remained. The Court's analysis of the FHA claim ran only two paragraphs and rested on its view that "the gender-segregated schedule applies to men and women equally." *Curto v. A Country Place Condominium Assoc.*, 2018 WL 638749, at *4 (D.N.J. 2018). This appeal followed.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. 28 U.S.C. § 1291 gives us appellate jurisdiction.

We review the District Court's grant of summary judgment *de novo*. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). Summary judgment is warranted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all facts "in the light most favorable to the non-moving party" and draw all reasonable inferences in that party's favor. *Jutrowski*, 904 F.3d at 288.

## III. Analysis

The Fair Housing Act, 42 U.S.C. § 3604(b), makes it an unlawful housing practice to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities therewith, because of race, color, religion, sex, familial status, or national origin." Per regulation, here 24 C.F.R. § 100.65(b)(4), this includes "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person associated with him or her." The parties here do not dispute that the FHA applies to

8

the Condominium Association or that the communal pool is a "facility associated with a dwelling" within the meaning of the statute and regulation.[2]

---

[2] Although the Condominium Association's pool use policy was motivated by the Orthodox Jewish residents' religious beliefs, the Association did not mention the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"), at any point in its filings in the District Court or in its merits brief before us. (At our request, the parties discussed RFRA implications in supplemental memoranda.) Thus we determine that the Association has waived any possible RFRA defense to the plaintiffs' FHA claim.

Even had the Association asserted a RFRA defense, it would lack associational standing to assert the religious free exercise rights of its Orthodox Jewish members. To have associational standing, (1) individual members must have standing in their own right, (2) the interest asserted must be germane to the purpose of the organization, and (3) neither the claim nor the relief requested must require the participation of the individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977). The first prong is easily met here, but the Condominium Association does not have a religious purpose. Moreover, religious beliefs are highly personal, and in a typical RFRA case the parties asserting a burden on their religion would provide personal testimony about their beliefs and the nature of the burden. Here we have only the Association's general assertions as to the beliefs of its Orthodox members.

"Where a regulation or policy facially discriminates on the basis of the protected trait, in certain circumstances it may constitute per se or explicit discrimination because the protected trait by definition plays a role in the decision-making process." *Community Services, Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (internal citations and quotation marks omitted). The Condominium Association argues that its pool schedule is not discriminatory because it was not motivated by malice toward either sex. But in *Wind Gap* we expressly held that a showing of malice is not required "where a plaintiff demonstrates that the challenged action involves disparate treatment through explicit facial discrimination. . . . Rather, the focus is on the explicit terms of the discrimination."[3] *Id.* (internal citations and quotation marks omitted).

Looking to the express terms of the pool policy, the Association emphasizes that it allows for roughly equal swimming time for both men and women in the aggregate. But this is not enough to save the pool schedule, which discriminates in its allotment of different times to men and women in addition to employing sex as its criterion. Under the most recent version of the schedule, women are able to swim for only 3.5 hours after 5:00 p.m. on weeknights,

---

[3] This is different from when a plaintiff relies on indirect evidence of discrimination. In those cases, a plaintiff must first make out a *prima facie* case of discrimination, which usually means showing circumstances supporting a plausible inference of discrimination. Then the defendant must give a legitimate, nondiscriminatory reason for its actions, which the plaintiff may then show was a pretext for discrimination. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

compared to 16.5 hours for men. The schedule also assigns to men the entire period from 4:00 p.m. onward on Friday afternoons. Women with regular-hour jobs thus have little access to the pool during the work week, and the schedule appears to reflect particular assumptions about the roles of men and women. *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (Fourteenth Amendment forbids sex classifications based on "overbroad generalizations about the different talents, capacities, or preferences" of men and women); *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724–25 (1982) (review of gender classifications must be "free of fixed notions concerning the roles and abilities" of men and women). In light of these specific inequitable features, the schedule discriminates against women under the FHA even though it provides roughly equal aggregate swimming time to each gender.[4]

---

[4] Plaintiffs argue that any schedule of sex-segregated swimming hours would necessarily violate the FHA, and they see the Association's arguments as akin to the "separate but equal" framework rejected in *Brown v. Board of Education*, 347 U.S. 483 (1954). We need not address that contention, and its potentially far-reaching implications, as this specific pool schedule is plainly discriminatory in its specifics. Thus we also need not consider the Association's argument that prohibiting single-sex swimming hours altogether would discriminate against the Orthodox Jewish residents and thereby itself violate the FHA. Moreover, as Judge Fuentes notes in his concurrence, the Association fails to substantiate its claim that eliminating segregated swimming hours would have a discriminatory effect on the Orthodox residents at A Country Place, as we do not know how many of the Orthodox community use the pool or how many would not use a mixed-

11

\* \* \* \* \*

In this context we reverse and remand the case to the District Court to enter summary judgment in favor of the plaintiffs on their claim under the Fair Housing Act. We leave to the Court whether it continues to decline the exercise of supplemental jurisdiction over plaintiffs' state law claims.

---

sex pool because of religious objections. *See* Concurring Op. at 4–5.

FUENTES, *Circuit Judge*, concurring.

For decades, our jurisprudence has denounced the very notion of "separate, but equal" policies. In *Brown v. Board of Education*, the Supreme Court recognized that "the doctrine of 'separate but equal' has no place" because separate facilities are "inherently unequal."[1] The Court was even more explicit in *Loving v. Virginia*: "[W]e reject the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations . . . ."[2]

Our vehement disapproval of segregation does not weaken when we adjudicate sex discrimination rather than racial discrimination cases. "Separate but equal treatment on the basis of sex is as self-contradictory as separate but equal on the basis of race."[3] In *Healey v. Southwood Psychiatric Hospital*, we explained that "[w]hen open and explicit use of gender is employed . . . the systemic discrimination is in effect 'admitted' by the [defendant], and the case will turn on whether such overt disparate treatment is for some reason justified" under the relevant statute.[4]

---

[1] 347 U.S. 483, 495 (1954).

[2] 388 U.S. 1, 8 (1967).

[3] *N.L.R.B. v. Local 106, Glass Bottle Blowers Ass'n*, 520 F.2d 693, 695 (6th Cir. 1975).

[4] 78 F.3d 128, 132 (3d Cir. 1996). Although *Healey* was an employment discrimination case, we frequently rely on our Title VII jurisprudence to guide our understanding of the FHA's antidiscrimination provisions. *See Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 n.5 (3d Cir. 2005).

While the majority opinion explains that we do not reach the issue of "whether sex-segregated swimming hours necessarily violate the FHA,"[5] I write separately to express my skepticism that the pool's sex-segregated schedule could be saved by a more even allocation of evening hours between men and women. Our jurisprudence makes clear that facial discrimination does not become lawful merely because its burdens are felt by members of both sexes. We would have no problem concluding, for example, that a pool schedule that allocates two-thirds of its hours to swimming segregated by race and one-third of its hours to "Integrated Swimming" would be intolerable under the FHA. And the FHA's prohibition on discrimination does not distinguish between discrimination on the basis of sex and discrimination on the basis of race.[6]

We have never considered whether there may be exceptions to the FHA's antidiscrimination provision.[7] Our sister circuits that have considered the issue have determined that in certain circumstances, there may be legal justifications for facial discrimination under the FHA. The Sixth, Ninth, and Tenth Circuits have concluded that facially discriminatory policies may be justified if a defendant can show that the

_____

[5] Maj. Op. at 4.

[6] 42 U.S.C. § 3604(b) (prohibiting discrimination "because of race, color, religion, sex, familial status, or national origin").

[7] Section 3607 creates a narrow exception by allowing religious organizations that sell or rent housing to give preference to members of the same religion, unless membership in the religion itself is "restricted on account of race, color, or national origin." *See id.* § 3607(a). That exception is inapplicable here.

policies benefit the protected class or respond to legitimate safety concerns.[8] The Eighth Circuit uses a different standard, requiring defendants to demonstrate that the facially discriminatory policy "was necessary to promote a governmental interest commensurate with the level of scrutiny afforded the class of people affected by the law under the equal protection clause."[9]

There are two reasons why we need not now determine whether to adopt one of the tests put forth by our sister circuits. First, as the majority opinion rightly concludes, in this case there is evidence of both facial discrimination and disparate treatment. The stark difference between men's swimming hours and women's swimming hours during weekday evenings

---

[8] *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007); *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503–04 (10th Cir. 1995). As an example of how analysis of gender-based facial discrimination under the FHA might work, in *Community House v. City of Boise*, the Ninth Circuit determined that a religious homeless shelter's policy of excluding women and families was facially discriminatory "because it explicitly treats women and families different from men." *Cmty. House*, 490 F.3d at 1045. The court also addressed the shelter's suggestion that it would create a separate shelter for women and families, casting doubt on that justification because "there is a serious question that sheltering women and families . . . separately from men would benefit women and families by satisfying a required safety need." *Id.* at 1052.

[9] *Familystyle of St. Paul, Inc. v. City of St. Paul*, 923 F.2d 91, 93 (8th Cir. 1991).

3

is fatal to the pool schedule because it perpetuates stereotypes about the relative likelihood of men and women to be working during those hours. The Condominium Association attempted to justify the disparity by pointing to the deposition testimony of Ms. Engleman, who stated that on Friday afternoons, women are home preparing for the Shabbat holiday. The testimony is equivocal as to whether preparation for Shabbat is a religious mandate or a cultural practice that could be rooted in gender stereotypes about the role of women in homemaking. If it is the latter, of course, it cannot justify the discriminatory treatment of women. "[G]eneralizations about 'the way women are,' [and] estimates of what is appropriate for *most women*, no longer justify denying opportunity to women . . . ."[10] Even if Ms. Engleman were explaining a religious requirement, her reasoning cannot justify the disparity between men's hours and women's hours on Mondays through Thursdays.

Second, regardless of the test we adopted, the Condominium Association's justifications would fail. Although the Association defends its discrimination on the basis of the religious concerns of its Orthodox Jewish members,[11] it did not argue that its discriminatory schedule

---

[10] *United States v. Virginia*, 518 U.S. 515, 550 (1996).

[11] The contemporaneous evidence suggests that the Association justified the pool schedule as the will of the majority rather than as a necessary accommodation to Orthodox Jewish residents. The Association informed Ms. Curto that "[t]he vast majority of people would abolish any mixed swimming, because that is the will of the majority." J.A. 174. The Association also informed Mr. Lusardi that "we are well within our rights to serve the vast majority of the

4

was justified under any recognized exception to the FHA's antidiscrimination provision.  Specifically, it did not assert that the association's policies benefitted the affected protected class (here, women) or that they responded to legitimate safety concerns.[12]  It also waived any argument that its discrimination was protected by the Religious Freedom Restoration Act.  The Association instead argued that if it did not discriminate on the basis of sex, it would be discriminating against its Orthodox Jewish population because they would be unable to use the swimming pool due to religious modesty laws.  But there is no evidence in the record of the number of Orthodox Jewish residents who use the pool, and no evidence of the number of Orthodox Jewish pool users who would be unable to use a mixed-sex pool due to religious objections.[13]  At the very least, at the summary judgment stage, the Condominium Association was required to put forward more than speculation about the effects of integrating the swimming pool.

In sum, I join the majority decision to reverse the decision of the District Court not only because of the pool schedule's disparate treatment of women, but also because it is *per se* facially discriminatory in violation of the FHA.

---

community . . . .  You are inconsiderate of the majority and wish for minority rule.  That is not our community."  J.A. 176.
[12] *See Cmty. House, Inc.*, 490 F.3d at 1050.
[13] In her deposition, Ms. Engleman said that all Orthodox Jews would oppose mixed swimming, but later admitted that some religious laws are open to different interpretations, like laws requiring men and women to remain separate in public spaces.